JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |
|---|---|
| ARMINAK & ASSOCIATES, INC.,<br><br>        **Plaintiff,**<br><br>    **vs.**<br><br>SAINT-GOBAIN CALMAR, INC., now known as MEADWESTVACO CALMAR, INC.,<br><br>        **Defendant.** | **Case No.: SACV 04-01455-CJC(AJWx)**<br><br><br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

       This antitrust case presents the following novel legal question: can a plaintiff challenging a defendant's exclusive dealing contracts under § 2 of the Sherman Act introduce evidence at trial regarding the defendant's other business conduct and activities to prove that the defendant had an anticompetitive intent with respect to those contracts? If the defendant's other business conduct and activities were procompetitive and lawful, the answer is no.

# I

Plaintiff Arminak & Associates ("Arminak") claims that Defendant MeadWestvaco Calmar ("Calmar") violated the monopolization and attempted monopolization prohibitions of § 2 of the Sherman Act by entering into exclusive contracts with purchasers in a manner that unlawfully foreclosed competition in the market for trigger sprayers primarily used to dispense liquid household products.  *See* Fourth Am. Compl. ("FAC") ¶¶ 13, 20(b), 21, 22(e), 24.  Arminak contends that these exclusive contracts had two defining features.  First, they required "purchasers to purchase the full line of Calmar's products on an exclusive basis for periods of three (3) or five (5) years."  FAC ¶ 13.  Second, they contained a right of first refusal, which Arminak refers to as a "'meet or beat' clause."  *Id.*  Arminak contends that Calmar's exclusive contracts have had the anticompetitive "effect of . . . exclud[ing] Calmar's competitors, including Arminak, from competing for the business of large customers as to individual products, or competing at all."  *Id.*

Arminak further asserts that Calmar engaged in five types of admittedly lawful conduct with, Arminak alleges, an anticompetitive intent and purpose.  *See* Mem. P. & A. Opp'n at 1, 2 (referring to this conduct as "five lawful acts").  Arminak complains about Calmar's: (1) low or below cost pricing; (2) creation of a "Value Group" division that was responsible for producing a new trigger sprayer product ("VTS" trigger sprayers) intended to compete with offerings from Arminak and others; (3) patent litigation against Arminak;[1] (4) purchase of certain ContinentalAFA intellectual property, trigger sprayer molds, and production lines and post-acquisition use of those assets; and (5) business dealings related to KIK, Kaufman Container, and Changing Paradigms.

---

[1] Calmar raised its patent infringement claims against Arminak by way of a counterclaim when Arminak sought declaratory judgment in 2004.

Arminak does not argue that any of these five lawful acts, standing alone, would support a favorable jury verdict on a § 2 claim, nor does it seek damages attributable to any of this conduct.  *Id.* at 1.  Despite these admissions, Arminak contends that it should be permitted to present evidence of Calmar's conduct in these five areas to the jury on the basis that it further evidences Calmar's anticompetitive intent to unlawfully achieve or maintain a monopoly in the trigger sprayer market.  The parties have briefed this issue on a motion for summary judgment so that the Court can decide this pure issue of law—which also has significant evidentiary consequences—on the basis of existing legal authority and a sufficient evidentiary record.[2]

## II

The antitrust laws "were enacted for 'the protection of competition not competitors.'"  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).  And "injuries to rivals are byproducts of vigorous competition" of the kind and quality that the antitrust laws seek to nurture.  *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986).  Tougher competition entails steeper stakes for everyone involved.  Indeed, "[t]he firm that slashes costs the most captures the greatest sales and inflicts the greatest injury.  The deeper the injury to rivals, the greater the potential benefit" to competition and consumers.  *Id.*

---

[2] In its Opposition, Arminak criticizes this procedure, asserting that a motion in limine is a more appropriate procedural vehicle.  *See* Mem. P. & A. Opp'n at 1–2.  This criticism is baffling.  The Court and parties previously confronted the challenging trial implications of Arminak's theory that "if these legal acts . . . are part of a larger scheme to monopolize, they may be deemed illegal . . . and therefore lose their legal character."  Jan. 28, 2011 Hr'g Tr. 103:7–11.  To bring closure and a resolution of the issue, Arminak proposed that Calmar "should probably tee this up as a motion for summary judgment." *Id.* at 127:21–22.  Arminak cannot now be heard to complain about the Court adopting the same procedure that Arminak itself advocated.

Although "the antitrust laws are not balm for rivals' wounds," *id.*, they empower the injured to seek redress when a competitor has transgressed the outer limits of lawful competition.  Courts have long recognized that properly enforcing those limits is no simple matter.  *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 283–84 (6th Cir. 1898) ("It is true that there are some cases in which the courts, mistaking, as we conceive, the proper limits of the relaxation of the rules for determining the unreasonableness of restraints of trade, have set sail on a sea of doubt, and have assumed the power to say . . . how much restraint of competition is in the public interest, and how much is not.").  Policing the limits either too zealously or too laxly impedes competition and harms consumers.  As they must when presented with cases and controversies, courts have, with varying levels of success, attempted to calibrate appropriate limits on competitive conduct.

This case centers on Arminak's contention that Calmar used exclusive dealing contracts to monopolize or attempt to monopolize "part of the trade or commerce among the several states, or with foreign nations" in violation of § 2 of the Sherman Act.  15 U.S.C. § 2.  "It is settled law that [a § 2 monopolization] offense requires, in addition to the possession of monopoly power in the relevant market, 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  A plaintiff pursuing a monopolization claim must show (1) "'the possession of monopoly power in the relevant market'" and (2) the willful "'acquisition or perpetuation of this power by illegitimate "predatory" practices.'"  *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 506 (9th Cir. 2010) (quoting *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541–52 (9th Cir. 1991)); *see also Trinko*, 540 U.S. at 407 (explaining that "[t]o safeguard the incentive to innovate, the possession of monopoly power will not

be found unlawful unless it is accompanied by an element of anticompetitive *conduct*"). Although the defendant monopolist must have had a general intent to engage in anticompetitive conduct, "no monopolist monopolizes unconscious of what he is doing" and "[i]mproper exclusion . . . is always deliberately intended." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602–03 (1985) (internal quotation marks omitted); *see also Drinkwine v. Federated Publ'ns, Inc.*, 780 F.2d 735, 739 (9th Cir. 1985) ("Intent must also exist but is subsumed in an analysis of the exclusionary conduct." (citing *Aspen Skiing*, 472 U.S. at 602–03)).

To establish an attempted monopolization claim, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "Anticompetitive conduct is behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008).

Specific intent to monopolize "may be inferred from . . . 'conduct forming the basis for a substantial claim of restraint of trade'" or "'conduct that is clearly threatening to competition or clearly exclusionary,'" but the "focus must be on proof of unfair or predatory conduct." *Drinkwine*, 780 F.2d at 740 (quoting *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co.*, 668 F.2d 1014, 1029 n.11 (9th Cir. 1981)). It "cannot be inferred from conduct alone unless that conduct is predatory or anticompetitive and forms the basis for a substantial claim of restraint of trade." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544 (9th Cir. 1983), *overruled on other grounds by Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034 (9th Cir. 1987); *see also Indep. Entm't Grp., Inc. v. Nat'l Basketball Ass'n*, 853 F. Supp. 333, 340 (C.D. Cal. 1994) ("[T]he intent to exclude competitors through lawful means cannot be predatory as a matter of law.").

Permitting plaintiffs to submit evidence of procompetitive conduct to attempt to
demonstrate anticompetitive intent would chill competition on the merits and undermine
the very purpose of the antitrust laws.  *See A.A. Poultry Farms, Inc. v. Rose Acre Farms,
Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989) (explaining that permitting plaintiffs to "use the
vigorous, nasty pursuit of sales as evidence of a forbidden 'intent' . . . run[s] the risk of
penalizing the motive forces of competition").

More generally, the Supreme Court has cautioned that § 2 liability should not be
"undu[ly] expan[ded]" since "[m]istaken inferences and resulting false condemnations
'are especially costly, because they chill the very conduct the antitrust laws are designed
to protect.'"  *Trinko*, 540 U.S. at 414 (quoting *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 594 (1986)).  The antitrust laws exist to promote competition,
including lawful competition by monopolists.  *See Alaska Airlines, Inc.*, 948 F.2d at 547.

Arminak asserts that Calmar is liable under both monopolization and attempted
monopolization theories because it engaged in a "scheme and plan . . . to monopolize"
that it carried out "with the specific intent of eliminating competition in general and the
specific competition of Arminak in the trigger sprayer market."  FAC ¶ 20.  At this stage
of the litigation, Arminak concedes that only its exclusive dealing claim alleges unlawful
conduct that could support antitrust liability and damages.  Mem. P. & A. Opp'n at 1.
This was not always so, as Arminak's FAC contains myriad allegations of other unlawful
acts, *see* FAC ¶¶ 14–16, 20, and Arminak has also pursued and abandoned a monopoly
broth or modified monopoly broth theory under which the other five categories of
conduct at issue in this motion were allegedly unlawful when combined with the
exclusive dealing, *compare* Dkt. # 410 at 4 (Arminak asserting that the "mix of Calmar's
anticompetitive activities, some unlawful in and of themselves, and some arguably
lawful, present a classic case of . . . 'monopoly broth.'" (emphasis omitted)), *with* Mar.
21, 2011 Hr'g Tr. 44:22–24 (Arminak apologizing for "inject[ing] this notion of

monopoly broth into the case" because "[t]his is not a monopoly broth case").  Arminak
now contends that it is entitled to present evidence to the jury regarding Calmar's lawful
conduct in the five other areas to demonstrate Calmar's "scheme to monopolize" and
anticompetitive "intent to achieve or maintain monopoly power."  Mem. P. & A. Opp'n
at 1.  Arminak would agree to a limiting instruction consistent with its intended use of
this evidence.[3]  *See id.* at 13.  The Court now analyzes each category of conduct
separately.

     The first category of conduct that Arminak wants to present at trial concerns
Calmar's selling of certain trigger sprayers "at prices at, or below, its total economic
cost."  Mem. P. & A. Opp'n at 24.  The Supreme Court has "carefully limited the
circumstances under which plaintiffs can state a Sherman Act claim by alleging that
prices are too low."  *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 129 S.
Ct. 1109, 1120 (2009).  "[T]o prevail on a predatory pricing claim, a plaintiff must
demonstrate that: (1) 'the prices complained of are below an appropriate measure of its
rival's costs'; and (2) there is a 'dangerous probability' that the defendant will be able to
recoup its 'investment' in below-cost prices."  *Id.* (quoting *Brooke Grp. Ltd. v. Brown &
Williamson Tobacco Corp.*, 509 U.S. 209, 222–24 (1993)).  In the Ninth Circuit, prices
are measured against average variable cost.  *Cascade Health Solutions*, 515 F.3d at 909–
10.  Variable costs "change with the amount of output," *id.* at 909, and average variable
cost is "the sum of all variable costs divided by output," *Rebel Oil Co. v. Atl. Richfield
Co.*, 146 F.3d 1088, 1092–93 (9th Cir. 1998).

     Arminak has not provided evidence and "[t]here is no evidence [it] intend[s] to
offer" that Calmar ever priced its trigger sprayers below average variable cost.  Mar. 21,

---

[3] Arminak's proposed jury instruction would communicate that "these other five non-contract acts . . .
are relevant, but independently 'lawful' and therefore cannot be used as a predicate for a finding of
antitrust liability or damages standing alone."  Mem. P. & A. Opp'n at 13 (emphasis omitted).

2011 Hr'g Tr. 52:7–10.  Although there is evidence that a retained consultant concluded that some of Calmar's trigger sprayers were for a period of time sold at or below a measure of economic profitability, this measure of profitability factored in costs beyond variable costs including "taxes, overhead, and . . . capital" costs.  *See* Mergy Dep. at 20, 24, 37:9–13.  On this record, there is no genuine dispute of material fact that Calmar's pricing was not predatory under the first prong of the *Brooke Group* test.  Indeed, Arminak has conceded that this fact dissuaded it from bringing a separate predatory pricing claim.  *See* Jan. 28, 2011 Hr'g Tr.109:1–2, 116:13–18; *see also* Mem. P. & A. Opp'n at 24 n.18.

Calmar's aggressive pricing was not only lawful but also procompetitive as a matter of law.[4]  *See Cascade Health Solutions*, 515 F.3d at 896 (observing that "benefits . . . flow to consumers from discounted prices" and that "price cutting is a practice the antitrust laws aim to promote").  As the Supreme Court has recently reiterated, winning business by offering low but not predatory prices "'often is the very essence of competition.'"  *Linkline*, 129 S. Ct. at 1120 (quoting *Matsushita*, 475 U.S. at 594); *see also id.* ("'Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.'" (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990))); *id.* (explaining that imposing liability when prices are above predatory levels would undesirably cause businesses to "raise their retail prices or refrain from aggressive price competition to avoid potential antitrust liability," harming competition and consumers).  Calmar's low pricing was entirely lawful, promoted competition, and directly benefitted consumers of trigger sprayers.

---

[4] Whether specific conduct is anticompetitive "is a question of law" in appropriate cases.  *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996); *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 n.11 (9th Cir. 2004) (quoting *SmileCare Dental Grp.*, 88 F.3d at 783).

Arminak next cites Calmar's creation of a "VTS" trigger sprayer line to "'attack' and dislodge trigger sprayers offered by Arminak and other Chinese importers" and attempt to convert Arminak's customers. Mem. P. & A. at 21. The record reflects that Calmar observed that some customers preferred trigger sprayer offerings from Arminak and other competitors that were lower priced and had fewer bells and whistles. *See* McKernan Dep. 65:2–17 (former President of Calmar explaining that "the market was demanding something from [Calmar]"). Calmar sought to convert those customers by redesigning one of its existing offerings ("TS-800" trigger sprayers) to create the VTS trigger sprayers that would compete directly with the trigger sprayers offered by Arminak and others. Calmar streamlined the manufacturing process for VTS trigger sprayers so that the trigger sprayers could be priced more competitively. More specifically, Calmar reduced manufacturing costs by reducing the number of optional attributes available for VTS trigger sprayers relative to Calmar's higher priced trigger sprayer offerings. *See* Scheu Dep. 43:4–44:6 (former Calmar executive discussing how Calmar lowered manufacturing costs for VTS trigger sprayers). Arminak does not dispute these facts and concedes that Calmar's creation of VTS trigger sprayers was lawful. *See* Jan. 28, 2011 Hr'g Tr. 114:24–115:3, 116:11.

Contrary to Arminak's suggestions, Calmar's creation of VTS trigger sprayers promoted competition. Calmar identified a hole in its product line that put it at a competitive disadvantage with respect to certain customers. It responded with innovation and increased efficiency—both objects that the antitrust laws seek to foster. *See Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998–1000 (9th Cir. 2010) (discussing product redesign cases and emphasizing that the antitrust laws encourage innovations that make products more attractive to consumers); *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 483 (5th Cir. 2000) (describing competition's basic goals as "lower prices, better products, and more efficient production methods" (internal quotation marks omitted)); *Alaska Airlines, Inc.*, 948 F.2d at 547 (explaining that the

antitrust laws "do not stand as an obstacle" to lawful monopolists that are simply more
efficient and successfully innovative than their "rivals [that] cannot effectively
compete").  The result, a new trigger sprayer offering targeted at a previously neglected
customer base, increased competition on the merits for those customers.  *See Allied
Orthopedic Appliances Inc.*, 592 F.3d at 998 (explaining that even a monopolist is
"encouraged to compete aggressively on the merits, and any success it may achieve
solely through the process of invention and innovation is necessarily tolerated by the
antitrust laws" (internal quotation marks omitted)).  All of these results were good for the
market and competition.

Arminak also wishes to present evidence regarding Calmar's litigation conduct in
connection with its unsuccessful patent suit against Arminak.  *Noerr* immunity generally
shields a party that has brought a patent suit against a competitor from antitrust liability.
*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56
(1993).  A narrow exception permits the imposition of antitrust liability when a party's
suit is a (1) sham (2) intended to interfere directly with the business relationships of a
competitor.  *Id.* at 60.  A suit is not a sham unless it is "objectively baseless in the sense
that no reasonable litigant could realistically expect success on the merits."  *Id.*  "If an
objective litigant could conclude that the suit is reasonably calculated to elicit a favorable
outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham
exception must fail."  *Id.*  Only in cases involving objectively baseless suits does the
inquiry turn to whether the litigation was subjectively motivated by a desire to interfere
with a competitor's business relationships.  *Id.* at 60–61.

Here, the record demonstrates that Calmar's patent suit was not objectively
baseless and could not qualify under the sham exception.  On appeal, the United States
Court of Appeals for the Federal Circuit affirmed this Court's grant of summary
judgment in favor of Arminak on the issue of patent infringement.  *See Arminak &*

*Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1317–18 (Fed. Cir. 2007).  It is irrelevant that Calmar did not prevail because the Federal Circuit acknowledged that the suit raised a question of first impression that it had not yet "squarely addressed."  *Id.* at 1322.  Given this finding as to the novelty of a core issue raised in the suit, there can be no genuine dispute that the suit was not objectively baseless.  Arminak concedes this fact, admitting that "[t]here is no evidence that [Arminak] intend[s] to offer that [the patent suit was] baseless."  Mar. 21, 2011 Hr'g Tr. 52:6–7; *id.* at 53:13–14.[5]

Nevertheless, Arminak attempts to attach sinister motives to Calmar's patent suit.  But it is procompetitive, not anticompetitive, for businesses to pursue patent infringement litigation, if necessary, against competitors where there is an objective basis for such suits because these suits safeguard the procompetitive incentive to innovate fostered by the patent laws.  The patent laws "embod[y] a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150–51 (1989).  That bargain significantly benefits competition when it is working as intended.  *See Trinko*, 540 U.S. at 407 (discussing importance to competition of encouraging the "risk taking that produces innovation and economic growth").  When patents expire, competition benefits because the public may use and profit from previously patented innovations.  *See Bonito Boats* at 151.  Accordingly, the magnitude of the deferred benefit to competition depends on the number and quality of patentable creations.  The patent holder's period of exclusivity provides the incentive for individuals and businesses to spend the time, effort, energy, and resources necessary to devise patentable innovations.  *See TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 34 (2001) (explaining that, unlike the Lanham

---

[5] As Calmar notes, it would be a bizarre result if Arminak could present evidence to the jury concerning Calmar's subjective intent for litigating its patent claims—despite the fact that the litigation not was objectively baseless and Calmar has *Noerr* immunity—as evidence supporting its claim that an anticompetitive intent motivated Calmar's use of exclusive contracts.

Act governing trademarks, "the purpose of the patent law and its period of exclusivity" is
to "reward manufacturers for their innovation in creating a particular device").
Permitting patent holders to bring meritorious infringement suits against competitors to
protect the exclusivity of their patents is critical to the integrity of the incentive to
innovate arising from the patent laws and, therefore, procompetitive.  Conversely,
punishing patent holders filing non-sham infringement suits greatly diminishes the
incentive to innovate.  Thus, imposing antitrust liability on patent holders bringing non-
sham patent suits or even allowing a litigant to introduce evidence concerning non-sham
patent suits to prove a patent holder's anticompetitive intent would undermine the
incentive to innovate and harm competition.

The fourth category of conduct concerns Calmar's purchase and post-acquisition
use of certain ContinentalAFA assets including intellectual property, physical trigger
sprayer molds, and production lines.  ContinentalAFA—previously a competitor in the
trigger sprayer industry—filed for bankruptcy in August 2008.  Bids were invited for
ContinentalAFA's assets.  On October 15, 2008, the United States Bankruptcy Court for
the Eastern District of Missouri found Calmar's bid of $7,540,000 for certain
ContinentalAFA assets reasonable and approved the purchase.  Bass Decl. Ex. 15, at 1, 3,
4 (Bankruptcy Court's October 15, 2008 order).  As the Bankruptcy Court observed, no
other qualified bidder even submitted a bid for these assets.  *Id.* at 2.  Arminak concedes
that it does not and cannot "challeng[e] Calmar's initial act of acquiring
ContinentalAFA's" assets through an open and fair bidding process as unlawful or
anticompetitive.  Mem. P. & A. Opp'n at 25 (emphasis omitted).

Arminak instead focuses on how Calmar has used those assets.  More specifically,
Arminak contends that Calmar's acquisition of ContinentalAFA assets and post-
acquisition nonuse of some of those assets is lawful but "sheds light on Calmar's

anticompetitive intent" to gain market share and prevent those assets from "falling into the hands of its competitors." *Id.*

Calmar has presented evidence from October 2008 indicating that it intended, immediately following the purchase, to integrate assets obtained from ContinentalAFA into its product offerings. *See* Bass Decl. Ex. 5, at 1 (Calmar executive stating that the "initial plan" was to begin producing a ContinentalAFA trigger sprayer (the "T-8000" trigger sprayer) during the first quarter of 2009). It has, in fact, integrated ContinentalAFA's intellectual property into its offerings. In particular, it is undisputed that Calmar has been manufacturing a "bayonet closure" for Proctor & Gamble's trigger sprayers. *See* Sweeton Dep. 84:5–13 (Calmar executive citing use of bayonet closures for a Calmar trigger sprayer product). Arminak has also failed to produce any evidence that Calmar has refused to sell or license any of the ContinentalAFA assets to competitors in return for reasonable compensation or would be unwilling to do so.

Based on this record, there is no genuine dispute of material fact that Calmar's purchase and use of ContinentalAFA assets was lawful and procompetitive. Calmar fairly purchased the assets when other competitors, including Arminak, did not even submit a bid for them. Calmar intended to use the assets and has done so to more effectively compete for ContinentalAFA's former customers and to meet customer needs. That is vigorous competition on the merits of the type that the antitrust laws seek to promote. *See Allied Orthopedic Appliances Inc.*, 592 F.3d at 998.

Arminak also seeks to introduce evidence regarding Calmar's dealings related to KIK, Kaufman Container, and Changing Paradigms. Arminak argues that Calmar's conduct related to these businesses was "intended and designed to block Arminak's access to actual and potential trigger sprayer customers." Mem. P. & A. Opp'n at 28.

KIK was a customer of Calmar's whose contract with Calmar was set to expire in 2008. Bains Dep. 35:2–6. KIK decided to test the market before renewing its contract with Calmar. *Id.* at 35:7–15. At this time, KIK considered purchasing trigger sprayers from Arminak. *Id.* at 35:12–13. Arminak and Calmar competed for KIK's business on the basis of price, *id.* at 113:19–114:17, and quality. For example, Calmar's lowest price required KIK to contract with Calmar for all of its trigger sprayer needs. *See* Pepperman Decl. Ex. 1111. With respect to quality, Calmar had a significant edge in securing KIK's business. More specifically, KIK's internal testing revealed that Arminak's offerings did not meet KIK's quality requirements because components were failing when exposed to bleach. Baines Dep. 38:17–39:17. KIK also had concerns about Arminak's dip tubes even for use in its non-bleach products. *Id.* at 123:12–124:8. KIK ultimately signed a new contract with Calmar.

Changing Paradigms is a company that has purchased trigger sprayers and bottles from Kaufman Container. Slater Dep. 19:13–17. Kaufman Container, in turn, purchased trigger sprayers from Calmar in order to supply Changing Paradigms and other customers. *Id.* at 113:1–12. In 2008, Changing Paradigms considered purchasing 20% of its trigger sprayer requirements from Arminak. *Id.* at 104:5–22, 120:18–20. Calmar's contract with Kaufman Container included pricing concessions premised on Kaufman Container satisfying 100% of Changing Paradigms' trigger sprayer needs. *Id.* at 119:14–16. Calmar indicated to Kaufman Container that its trigger sprayer prices would increase if the volume of Calmar's sales to Kaufman Container decreased due to Kaufman Container no longer supplying 100% of Changing Paradigms' trigger sprayer needs. *Id.* at 119:20–22. Ultimately, however, Changing Paradigms continued to purchase 100% of its trigger sprayer needs from Kaufman Container. *Id.* at 105:1–5, 121:16–19. Arminak contends that a price increase by Calmar would have caused Kaufman Container to raise its prices to Changing Paradigms, which would have "offset the savings [Changing Paradigms] would enjoy" if it had purchased 20% of its trigger sprayers from Arminak.

Mem. P. & A. Opp'n at 28. This, according to Arminak, undermined Changing Paradigms' incentive to purchase 20% of its trigger sprayers from Arminak.

As with the other four categories of conduct, Arminak concedes that none of Calmar's dealings related to KIK, Kaufman Container, and Changing Paradigms were unlawful or give rise to damages. *Id.* at 1. And like the other four categories of conduct, the record demonstrates that Calmar's dealings with these companies were procompetitive. The "[a]ntitrust laws . . . are the Magna Carta of free enterprise," and guarantee "every business . . . the freedom to compete-to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). Here, Calmar competed vigorously to retain the business of KIK, Kaufman Container, and Changing Paradigms. Calmar primarily competed on the basis of price. As explained, competing on price "'to increase business often is the very essence of competition.'" *See Linkline*, 129 S. Ct. at 1120 (quoting *Matsushita*, 475 U.S. at 594); *Cascade Health Solutions*, 515 F.3d at 896. Calmar also retained KIK's business based on quality. *See Trinko*, 540 U.S. at 407 (citing offering a superior product as a lawful method of gaining monopoly power). KIK believed Calmar's trigger sprayers were of higher quality than Arminak's and better suited to its needs. Far from evidencing anticompetitive intent, these dealings reveal strong competition, tough negotiation, and freedom of contract at work.

It would be repugnant to the antitrust laws to let Arminak present evidence of these five lawful categories of conduct to the jury to prove Calmar's allegedly anticompetitive intent to acquire or maintain a monopoly in violation of § 2 of the Sherman Act. Calmar did absolutely nothing anticompetitive by lowering the prices of its products, designing a new product to meet competition, attempting to protect its intellectual property, making a strategic acquisition of a former competitor's assets, and flexing its economic muscle in contractual dealings with its own customers. To the contrary, all of Calmar's conduct

was beneficial to competition.  The antitrust laws were enacted to promote and protect Calmar's conduct.  Their purpose is certainly not to penalize it.

## III

For the foregoing reasons, Calmar's motion for partial summary judgment is GRANTED.  Arminak will not be permitted to present evidence at trial as to these five types of lawful and procompetitive conduct for the purpose of persuading the jury that Calmar had an anticompetitive intent to acquire or maintain monopoly power in violation of § 2.[6]

DATED:     June 7, 2011

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

---

[6] The parties have expressed a desire to certify this Court's ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  *See* Jan. 28, 2011 Hr'g Tr. 115:8–9 (Arminak's counsel representing that he was "not even sure [Arminak] would try the case if [the Court] [took] the five issues out").  The Court agrees that certification is appropriate because this Order involves a controlling question of law as to which there is substantial ground for difference of opinion and an immediate appeal will materially advance the ultimate termination of this litigation in light of the importance of this issue of law and its evidentiary consequences to the trial in this case.  Accordingly, the Court hereby CERTIFIES this order for interlocutory appeal pursuant to § 1292(b) and STAYS proceedings pending the appeal.